**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| VIRGINIA KULESA, individually and on behalf of all others similarly situated, | ) ) ) | NO. CV 12-0725 FMO (ANx) |
| Plaintiffs, | ) ) | **ORDER GRANTING PRELIMINARILY APPROVAL OF CLASS ACTION** |
| v. | ) ) | **SETTLEMENT AND CLASS NOTICE, AND SETTING FINAL FAIRNESS HEARING** |
| PC CLEANER, INC., a California Corp., | ) ) | |
| Defendant. | ) ) | |
| | ) | |

Having reviewed and considered all the briefing filed with respect to plaintiff's Renewed Motion for Preliminary Approval of Class Action Settlement ("Renewed Motion"), and concluding that oral argument is not necessary to resolve the Renewed Motion, see Fed. R. Civ. P. 78; Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), the court rules as follows.

**INTRODUCTION**

Plaintiff Virginia Kulesa ("plaintiff") filed this consumer product class action against PC Cleaner, Inc. ("PCI" or "defendant") on May 4, 2012, on the grounds that it deceptively designed and sold its PC Cleaner Pro software ("software"). On January 18, 2013, plaintiff filed a Third Amended Complaint ("TAC") alleging claims for: (1) unfair business practices pursuant to California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.; (2) fraudulent inducement; (3) breach of express warranties, Cal. Comm. Code § 2313; (4) breach

1  of contract; and (5) breach of the implied covenant of good faith and fair dealing.  (See, generally,

2  TAC).

3        This matter first came before the court on August 29, 2013, on plaintiff's Motion for

4  Preliminary Approval of Class Action Settlement ("Motion").  The court did not grant preliminary

5  approval at that time, and instead ordered the parties to file an amended motion with additional

6  briefing and supporting evidence, and an amended proposed class notice and claim form, among

7  other things.  (See Court's Order of August 29, 2013).  Pursuant to the Court's Order of August

8  29, 2013, plaintiff filed a Renewed Motion on September 26, 2013.  On November 19, 2013,

9  plaintiff filed a supplemental brief addressing additional outstanding issues identified by the Court's

10 Order of November 12, 2013.  (See Court's Order of November 12, 2013).

11       In their unopposed Renewed Motion, plaintiff seeks an order:  (1) preliminarily approving

12 the proposed settlement with defendant; (2) certifying the proposed settlement class; (3)

13 appointing class counsel; (4) appointing Kulesa as class representative; (5) approving the form

14 and content of the proposed notice class members; and (6) scheduling a fairness hearing for final

15 approval of the proposed settlement.  (See Notice of Renewed Motion at 1).

16                                    **BACKGROUND**

17 I.    FACTUAL ALLEGATIONS.

18       This case arises from plaintiff's January 17, 2012, online purchase of defendant's software

19 in an effort to redress her computer's malfunctions.  (TAC at ¶¶ 42-47).  Plaintiff asserts that she

20 read defendant's "express warranties" on its website, (id. at ¶ 44), and "[r]elying on the

21 representations made[,]" downloaded the software, and then paid "$29.97 to activate her copy of

22 PC Cleaner[.]"  (Id. at ¶¶ 45-47).  Plaintiff alleges that the software "could not and did not perform

23 as advertised by [defendant[,]" and "her computer continued to suffer from the same problems she

24 experienced prior to purchasing and running the software."  (Id. at ¶ 44).

25       According to plaintiff, PCI claims that its software "will increase the speed, performance,

26 and stability of a consumer's personal computer, . . . and remove harmful system errors."  (TAC

27 at ¶ 1).  "Through a common deceptive scheme, PCI uniformly deceives consumers into

28 purchasing the . . . software" by, among other things, allowing consumers to use a free trial

1  version which then "purportedly detects errors that lead to" viruses and malware.  (Id. at ¶¶ 3 &

2  4).  The software then informs the consumer that there are "thousands of harmful errors," and that

3  she must purchase the software to remove the purported errors.  (Id. at ¶ 4).  Plaintiff asserts that,

4  "contrary to [defendant's] marketing and in-software representations, neither the free trial version

5  nor the full registered version of [the software] performs any credible diagnostic testing on the

6  consumer's computer."  (Id. at ¶ 5).  Rather, the software is "designed to always report that a

7  user's computer is severely damaged[,] regardless of the [actual] condition or type of computer

8  the software is installed on."  (Id. at ¶ 31).  Defendant nevertheless represents that its software

9  will repair, clean, secure, and optimize the consumer's computer, when in reality, the software

10  allegedly performs only two functions:  cleaning the registry and removing temporary files.  (See

11  id. at ¶¶ 15-21).  Plaintiff claims that through its software design, and in conjunction with marketing

12  statements about the software's supposed utility, defendant intended to and did induce consumers

13  to pay for the software, thereby defrauding them.  (See id. & ¶¶ 34-38).

14  II.    THE SETTLEMENT AGREEMENT

15       On May 15, 2013, the parties participated in a private mediation session before John Bates

16  of JAMS.  (See Renewed Motion at Exh. 4, Declaration of Benjamin H. Richman in Support of

17  Preliminary Approval of Class Action Settlement ("Richman Decl.") at ¶¶ 9 & 10).  The parties were

18  able to "reach[] an agreement in principle as to the primary terms of a classwide settlement[,]" and

19  over "several more months . . . finalized[d] all of the ancillary terms[.]"  (Id. at ¶ 10)

20       The proposed settlement class is defined by the parties as:

21            [A]ll individuals and entities residing in the United States and its territories

22            that, on or before the date on which the Court enters an order preliminarily

23            approving the settlement, purchased any and all versions of the following

24            software: PC Cleaner Pro 2011, PC Cleaner Pro 2012 and PC Cleaner Pro

25            2013.

26  (Renewed Motion at 12; id. at Exh. 1, Stipulation of Class Action Settlement ("Settlement

27  Agreement") at § II).

28       A significant portion of the settlement agreement's benefit to class members consists of

3

injunctive-type relief.  (See Settlement Agreement at ¶ VI.A).  First, the settlement agreement requires defendant to modify the current versions of its software products to: (1) eliminate usage of the term "damage level" to refer to the harm posed by detected items during a diagnostic scan, and (2) "include accurate in-software "hoverbox" (i.e., a dialog box displayed when a user rolls over an icon with their mouse) descriptions . . . [that] shall describe the path to in-software links that direct the user to documentation contained on PCI's website that explains the Software Products' concern levels for the types of items detected through the software's scans."  (Id.). Second, each class member will be entitled to receive three months of free access to defendant's PC Antivirus Pro 2013 software.  (Id. at § VI.B.3)

The settlement agreement also provides monetary relief to the class, entitling each class member who submits a valid Claim Form to receive a single payment of $10.00.  (Settlement Agreement at § VI.B.2 & Exh. B ("Claim Form")).  Defendant also agrees to pay for settlement administration costs and expenses, (id. at § VII.C), attorney's fees in the amount of $318,000, (id. at § XI.B), and a $2000 incentive award to plaintiff as class representative.  (Id. at § XI.A).

## STANDARD OF REVIEW

"[I]n the context of a case in which the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003).

I.    CLASS CERTIFICATION

"Parties seeking class certification for settlement purposes must satisfy the requirements of Federal Rule of Civil Procedure 23[.]"  Sandoval v. Roadlink USA Pacific, Inc., 2011 WL 5443777, *2 (C.D. Cal. 2011) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620, 117 S.Ct. 2231, 2248 (1997)).  "A court considering such a request should give the Rule 23 certification factors 'undiluted, even heightened, attention in the settlement context.'"  Id. (quoting Amchem, 521 U.S. at 620, 117 S.Ct. at 2248).  "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." Amchem, 521 U.S. at 620, 117 S.Ct. at 2248.

A party seeking class certification must first demonstrate that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

"Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2548 (2011).  Rule 23(b) is satisfied if:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

5

          (C) the desirability or undesirability of concentrating the litigation of the

          claims in the particular forum; and

          (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(1)-(3).

## II.     FAIRNESS OF CLASS ACTION SETTLEMENT.

Rule 23 provides that "the claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). "The primary concern of [Rule 23(e)] is the protection of th[e] class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties." Officers for Justice v. Civil Service Com., 688 F.2d 615, 624 (9th Cir. 1982), cert. denied 459 U.S. 1217 (1983). Accordingly, a district court must determine whether a proposed class action settlement is "fundamentally fair, adequate, and reasonable." Staton, 327 F.3d at 959; see Fed. R. Civ. Proc. 23(e). Whether to approve a class action settlement is "committed to the sound discretion of the trial judge." Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir.), cert. denied, Hoffer v. City of Seattle, 506 U.S. 953 (1992) (internal quotation marks and citation omitted).

"If the [settlement] proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Approval of a class action settlement requires a two-step process – a preliminary approval followed by a later final approval. See West v. Circle K Stores, Inc., 2006 WL 1652598, *2 (E.D. Cal. 2006) ("[A]pproval of a class action settlement takes place in two stages."); Tijero v. Aaron Bros., Inc., 2013 WL 60464, *6 (N.D. Cal. 2013) ("The decision of whether to approve a proposed class action settlement entails a two-step process."). The court must first determine whether the proposed settlement merits preliminary approval so that notice can be issued to class members and a future fairness hearing can be scheduled. See id.; Pereira v. Ralph's Grocery Co., 2010 WL 6510338, *2 (C.D. Cal. 2010) ("At the preliminary approval stage, some of [the] factors cannot be fully assessed. Accordingly, a full fairness analysis is unnecessary."). At the final approval stage, the court makes a complete determination regarding the fairness, reasonableness, and adequacy of the settlement and hears any objections of class members. See West, 2006 WL 1652598, at

*2.

For purposes of preliminary approval of a proposed class settlement, the court "must evaluate the terms of the settlement to determine whether they are within a range of possible judicial approval." Wright v. Linkus Enters., Inc., 259 F.R.D. 468, 472 (E.D. Cal. 2009). The court should preliminarily approve the settlement as long as a "preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval[.]" In re Vitamins Antitrust Litig., 2001 WL 856292, *4  (D.D.C. 2001) (quoting Manual for Complex Litigation, Third, § 30.41  (West 1999)).  At this stage, the court may grant preliminary approval of a settlement and direct notice to the class if the settlement: (1) appears to be the product of serious, informed, non-collusive negotiations; (2) falls within the range of possible approval; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) has no obvious deficiencies.  See Harris v. Vector Mktg. Corp., 2011 WL 1627973, * 7 (N.D. Cal. 2011) (granting preliminary approval of settlement in wage and hour class action); Alvarado v. Nederend, 2011 WL 90228, *5 (E.D. Cal. 2011) (same).  "Closer scrutiny is reserved for the final approval hearing."  Harris, 2011 WL 1627973, at *7; see In re Bluetooth Headset Products Liab. Litig., 654 F.3d 935, 946 (9th Cir. 2011) (setting forth eight factors to be examined by the court in determining final approval of settlement).

## DISCUSSION

I.    CONDITIONAL CLASS CERTIFICATION

    A.    Rule 23(a) Requirements.

        1.    **Numerosity.**

The first prerequisite of class certification requires that the class be "so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1).  "[T]he plaintiff need not show that it would be 'impossible' to join every class member."  Sandoval, 2011 WL 5443777, at *4. Although impracticability does not hinge only on the number of members in the putative class, joinder is usually impracticable if a class is "large in numbers."  See Jordan v. L.A. County, 669

1    F.2d 1311, 1319 (9th Cir.), vacated on other grounds, 459 U.S. 810 (1982) (class sizes of 39, 64,

2    and 74 are sufficient to satisfy the numerosity requirement).  "As a general matter, courts have

3    found that numerosity is satisfied when class size exceeds 40 members, but not satisfied when

4    membership dips below 21."  Slaven, 190 F.R.D. at 654; see Tait v. BSH Home Appliances Corp.,

5    289 F.R.D. 466, 473 (C.D. Cal. 2012).

6          Here, plaintiff submits that the putative class consists of "tens of thousands of individuals

7    and entities [that] have purchased the Software Products at issue. " (Motion at 12).  In support

8    of the Renewed Motion, defendant's principal, Cashier Myricks, submits a declaration stating that

9    defendant has identified "more than 450,000 transactions . . . that may have involved the purchase

10   of a copy of a version of PC Cleaner Pro[,]" but that it "is not able to determine [so] with

11   precision[.]"  (Renewed Motion at Exh. 5, Declaration of Cashier Myricks in Support of Preliminary

12   Approval of Class Action Settlement ("Myricks Decl.") at ¶ 3) (emphasis in original).  Accordingly,

13   the parties agreed to treat "each of the approximately 450,000 individuals who entered into [those]

14   transactions" as class members, and the settlement administrator will "sen[d] notice of the

15   Settlement . . . [to] each of the individuals identified in Defendant's records."  (Supplemental

16   Briefing in Support of Preliminary Approval of Class Action Settlement ("Supplemental Br.") at 9).

17   The class size therefore meets the numerosity requirement, since its size is far beyond 40

18   members.

19                    2.    **Commonality.**

20         To show commonality, a plaintiff "must demonstrate that there are questions of fact and law

21   that are common to the class."  Ellis, 657 F.3d at 981(citing Fed. R. Civ. P. 23(a)(2)).  "The

22   requirements of Rule 23(a)(2) have been construed permissively, and all questions of fact and law

23   need not be common to satisfy the rule."  Id.  Indeed, "for purposes of Rule 23(a)(2) even a single

24   [common] question will do."  Dukes, 131 S. Ct. at 2556 (internal quotation marks omitted).

25         "Commonality exists when there is either a common legal issue stemming from divergent

26   factual predicates or a common nucleus of facts resulting in divergent legal theories."  Barbosa

27   v. Cargill Meat Solutions Corp., 2013 WL 3340939, *7 (E.D. Cal. 2013) (citing Hanlon v. Chrysler

28   Corp., 150 F.3d 1011, 1019 (9th Cir. 1998)).  "As clarified in [Dukes], a plaintiff must demonstrate

                                                8

1    that the class members 'have suffered the same injury' and that their claims 'depend upon a

2    common contention . . . of such a nature that [it] is capable of classwide resolution – which means

3    that determination of its truth or falsity will resolve an issue that is central to the validity of each

4    one of the claims in one stroke.'"  Id. (quoting Dukes, 131 S.Ct. at 2551).

5            Here, there are common questions of fact and law arising from defendant's computer

6    software.  Plaintiff alleges that defendant "uniformly deceives consumers into purchasing the

7    software product at issue" "[t]hrough a common deceptive scheme."  (TAC at ¶ 2).  She contends

8    that defendant designed its software products so that they functioned in essentially the same

9    manner on each settlement class member's computer, and it also disseminated substantially the

10   same marketing and promotional materials regarding their purported functionality to all class

11   members.  (See id. at ¶ 3, 4 & § II).  Plaintiff accordingly asserts that defendant's uniform conduct

12   accordingly raises several common factual issues including:  (i) whether defendant intentionally

13   designed the software products to falsely report the existence of errors on users' computers; (ii)

14   whether the software products exaggerate the severity of errors detected on users' computers;

15   (iii) whether defendant intentionally designed the software, and its respective promotional

16   materials, to deceive consumers into purchasing them; and (iv) whether plaintiff and the class

17   members overpaid for the software products.  (See Renewed Motion at 13; TAC at ¶ 58).

18           There are also common questions of law, such as whether defendant's alleged conduct

19   constitutes:  (i) a violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200,

20   et seq.; (ii) fraudulent inducement; (iii) breach of express warranties; (iv) breach of contract; and

21   (v) breach of the implied covenant of good faith and fair dealing.  Where, as here, class members

22   allege that a defendant made uniform deceptive representations regarding its product, common

23   questions of law exist.  See Johnson v. Gen. Mills, Inc., 275 F.R.D. 282, 286-87 (C.D. Cal. 2011)

24   (finding common issues of law and fact where defendant allegedly misrepresented health benefits

25   of yogurt product); Waller v. Hewlett-Packard Co., 2013 WL 5551642, *11 (S.D. Cal. 2013) (the

26   common contention is that HP misrepresented how [a computer backup device] works and what

27   it can do, in violation of California's UCL, and that all members of the putative class were misled.

28   One question that raises is whether the representations at issue are likely to deceive the average

1   consumer - a question that can be answered uniformly in either the positive or negative. This is

2   enough to establish commonality.").  The commonality requirement is therefore satisfied.

3               3.   **Typicality.**

4          To demonstrate typicality, a plaintiff "must show that the named parties' claims are typical

5   of the class." Ellis, 657 F.3d at 984 (citing Fed. R. Civ. P. 23(a)(3)).  "The test of typicality is

6   whether other members have the same or similar injury, whether the action is based on conduct

7   which is not unique to the named plaintiffs, and whether other class members have been injured

8   by the same course of conduct." Id. (internal quotation marks and citation omitted).  "Typicality

9   refers to the nature of the claim or defense of the class representative, and not to the specific facts

10  from which it arose or the relief sought." Id. (internal quotation marks and citation omitted).  "The

11  typicality requirement demands that a named plaintiff's claims be 'reasonably co-extensive with

12  those of absent class members,' although 'they need not be substantially identical.'" Avilez v.

13  Pinkerton Gov't Servs., 286 F.R.D. 450, 456 (C.D. Cal. 2012) (quoting Hanlon, 150 F.3d at 1020).

14         Here, plaintiff's claims arise from her allegation that defendant misrepresented the

15  capabilities and functioning of the PC Cleaner Pro, that she relied on the misrepresentations in

16  purchasing the software, and she thereafter owned software of diminished capacity and value,

17  which are also the claims of members of the putative class.  (See TAC at ¶¶ 44-49).  Typicality is

18  satisfied because plaintiff's claims are based on "the same event or practice or course of conduct

19  that gives rise to the claims of other class members and . . . are based on the same legal theory."

20  Brown v. NFL Players Ass'n., 281 F.R.D. 437, 442 (C.D. Cal. 2012); see Johnson v. Gen. Mills,

21  Inc., 275 F.R.D. 282, 287 (C.D. Cal. 2011) (finding typicality where plaintiff claimed "that he, like

22  other reasonable consumers, purchased YoPlus in reliance on General Mills' representation that

23  YoPlus promotes digestive health . . . [and] that [the product] did not live up to this representation

24  and that he suffered damages as a result.").  Finally, the court is not aware of any facts that would

25  subject the class representatives to "unique defenses which threaten to become the focus of the

26  litigation." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).  Rule 23(a)(3)'s

27  typicality requirement is therefore satisfied.

28               4.   **Adequacy of Representation.**

1    "The named Plaintiffs must fairly and adequately protect the interests of the class." Ellis,

2    657 F.3d at 985 (citing Fed. R. Civ. P. 23(a)(4)).  "To determine whether named plaintiffs will

3    adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and

4    their counsel have any conflicts of interest with other class members and (2) will the named

5    plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Id. (internal

6    quotation marks and citation omitted).  "Adequate representation depends on, among other

7    factors, an absence of antagonism between representatives and absentees, and a sharing of

8    interest between representatives and absentees." Id.

9         The proposed class representative, plaintiff Kulesa, does not appear to have any conflicts

10   of interest with the other class members, especially given that she has no individual claims

11   separate from the class claims.  (See, generally, TAC).  Plaintiff declares that her "purpose" in

12   pursuing this litigation has been, and continues to be, to "ensur[e] that [she], along with the other

13   [class] members . . . have the monies [they] overpaid for the Software Products at issue returned[],

14   . . . and that Defendant does not continue to utilize the same design and marketing practices at

15   issue here in the future."  (Declaration of Virginia Kulesa in Support of Preliminary Approval of

16   Class Action Settlement ("Kulesa Decl.") at ¶ 4; see also, generally, TAC; Renewed Motion at 15

17   ("Kulesa has the same interests as the other Settlement Class Members – they each have an

18   interest in having the monies they overpaid for the Software Products returned and in obtaining

19   the prospective measures necessary to ensure that PCI does not utilize the same deceptive

20   design and marketing practices in the future.")).  Accordingly, "[t]he adequacy-of-representation

21   requirement is met here because Plaintiff[] ha[s] the same interests as the absent Class

22   Members[.] Further, there is no apparent conflict of interest between the named Plaintiff['s] claims

23   and those of the other Class Members' – particularly because the named Plaintiff[] ha[s] no

24   separate and individual claims apart from the Class." Barbosa, 2013 WL 3340939, at *8 .

25        Additionally, the court is convinced that plaintiff's attorneys are competent and willing to

26   prosecute this action vigorously.  Plaintiff requests that the court appoint Jay Edelson, Benjamin

27   H. Richman and Chandler R. Givens of the law firm Edelson LLC ("class counsel").  (See

28   Renewed Motion at 16; Settlement Agreement § II).  Plaintiff asserts that proposed class counsel

"have extensive experience in class actions of similar size, scope, and complexity to the instant action[,]" and that "[t]hey have regularly engaged in major complex litigation involving consumer technology issues, have the resources necessary to conduct [the] litigation[,] . . . and have frequently been appointed lead class counsel by courts throughout the country. (Richman Decl. at ¶ 15). Attorney Benjamin H. Richman submitted the resume of the Edelson firm, which includes detailed descriptions of its past representations of successful class actions. (Id. at Exh. 4-A). The numerous prior class actions listed in the resume includes consumer fraud cases concerning computer software, all of which were settled for over $5 million. (See id.). Richman declares that "proposed Class Counsel have also diligently investigated, prosecuted, and dedicated substantial resources to the claims in this Action, and they will continue to do so throughout its pendency." (Id. at ¶¶ 17-18). Based on this evidence, the court is convinced that plaintiff's counsel are competent and willing to prosecute this action vigorously, and the adequacy-of-representation requirement is accordingly satisfied. See Barbosa, 2013 WL 3340939, at *9 ("There is no challenge to the competency of Class Counsel, and the Court finds that Plaintiffs are represented by experienced and competent counsel who have litigated numerous class action cases."); Avilez, 286 F.R.D. at 457 ("Defendants do not dispute and the evidence confirms that, as detailed in their declarations, Plaintiff's counsel are experienced class action litigators who have litigated many wage and hour class actions and have been certified as class counsel in numerous other class actions, particularly wage and hour class actions.").

B.      Rule 23(b) Requirements

"Where, as here, a plaintiff moves for class certification under Rule 23(b)(3), the plaintiff must prove[] the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Sandoval, 2011 WL 5443777, at *2; Fed. R. Civ. P. 23(b)(3).

1.      **Predominance.**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623, 117 S.Ct. at 2249.

1   "Rule 23(b)(3) focuses on the relationship between the common and individual issues.  When

2   common questions present a significant aspect of the case and they can be resolved for all

3   members of the class in a single adjudication, there is clear justification for handling the dispute

4   on a representative rather than on an individual basis."  Hanlon, 150 F.3d at 1022 (internal

5   quotation marks and citations omitted); see Kelley v. Microsoft Corp., 395 F'Appx. 431, 432 (9th

6   Cir. 2010) ("[T]he main concern in the predominance inquiry . . . [is] the balance between individual

7   and common issues.") (internal quotation marks and citation omitted) (alterations in original).

8   Further, as the Supreme Court recently ruled, plaintiffs' "damages must be capable of

9   determination on a classwide basis, and those damages must be traceable to a plaintiff's 'liability

10  case.'"  Munoz v. PHH Corp., 2013 WL 2146925, *24 (E.D. Cal. 2013) (citing Comcast Corp. v.

11  Behrend, 133 S.Ct. 1426 (2013)).

12      The TAC sufficiently demonstrates that "[a] common nucleus of facts and potential legal

13  remedies dominates this litigation."  Hanlon, 150 F.3d at 1022.  As explained in the court's

14  discussion finding commonality, see, supra at § I(A)(2), there are common questions regarding

15  the existence of a "common deceptive scheme," (see TAC at ¶ 2), regarding the design,

16  functionality, and marketing of the software, (see id. at ¶ 3, 4), including the similar types of

17  representations made to purportedly induce the class members to purchase the software at issue.

18  (See id.).  Courts have concluded that the same types of allegations of consumer products

19  misrepresentations at issue here predominate over individual issues.  For example, in Johnson,

20  the court explained that "the common issue that predominates is whether [defendant's] packaging

21  and marketing communicated a persistent and material message" regarding its product's benefits.

22  275 F.R.D. 282, 289; see also In re Ferrero Litig., 278 F.R.D. 552, 560 (S.D. Cal. 2011)

23  (predominance satisfied where class members had "common contention" that defendant "made

24  a material misrepresentation regarding the nutritious benefits of Nutella® that violated the UCL"

25  and "any injury suffered by a class member in this case stems from Defendant's common

26  advertising campaign of Nutella®"); Gonzalez v. Proctor & Gamble Co., 247 F.R.D. 616, 624 (S.D.

27  Cal. 2007) (permitting "an inference of common reliance when the allegations demonstrate that

28  a single, material misrepresentation was directly made to each class member").  Accordingly,

common questions of law and fact predominate over individual issues in this matter.

Finally, class members' individual damages are "capable of determination on a class-wide basis, and those damages [are] traceable to . . plaintiff[s'] 'liability case.'" Munoz, 2013 WL 2146925, at 24 (quoting Comcast, 133 S.Ct. at 1433). Each class member can recover a maximum of $15.00 for each purchase of the PC Cleaner Pro software, (see Supplemental Br. at 4), making the amount of individual damages amenable to a class-wide determination. The court is therefore persuaded that the predominance requirement is satisfied.

        2.   **Superiority.**

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case" and "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution. Hanlon, 150 F.3d at 1023. Rule 23(b)(3) provides a list of four non-exhaustive factors relevant to superiority. See Fed. R. Civ. P. 23(b)(3)(A)-(D).

The first factor considers "the class members' interests in individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). "This factor weighs against class certification where each class member has suffered sizeable damages or has an emotional stake in the litigation." Barbosa, 2013, WL 3340939, at *10. Here, plaintiff does not assert emotional damages, nor is there any indication that the amount of damages that any individual class member could recover is significant. (See, generally, TAC & Renewed Motion). Accordingly, the alternative method of resolution through individual claims for small amounts of damages of $15, would prove unfeasible for potential plaintiffs because the costs of litigation dwarfs potential recovery. (See Renewed Motion at 18-19); Leyva, 716 F.3d at 515 ("In light of the small size of the putative class members' potential individual monetary recovery, class certification may be the only feasible means for them to adjudicate their claims. Thus, class certification is also the superior method of adjudication."); Bruno v. Quten Research Inst., LLC, 280 F.R.D. 524, 537 (C.D. Cal. 2011) ("Given the small size of each class member's claim, class treatment is not merely the superior, but the only manner in which to ensure fair and efficient adjudication of the present action."). In short, "there is no evidence that Class members have any

1   interest in controlling prosecution of their claims separately nor would they likely have the

2   resources to do so." Munoz, 2013 WL 2146925 at *26.

3          The second factor to consider is "the extent and nature of any litigation concerning the

4   controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3)(B). There is

5   nothing before the court indicating that any other litigation is underway concerning the claims

6   raised in this case regarding the PC Cleaner Pro. See Barbosa, 2013 WL 3340939, at *10 ("[t]he

7   [c]ourt does not have any information that litigation concerning this controversy is currently being

8   pursued by or against the class members; thus, this factor is neutral.").

9          The third factor is "the desirability or undesirability of concentrating the litigation of the

10  claims in the particular forum," and the fourth factor is "the likely difficulties in managing a class

11  action." Fed. R. Civ. P. 23(b)(3)(C)-(D). "In the context of settlement, however, the third and

12  fourth factors are rendered moot and are irrelevant." Barbosa, 2013 WL 3340939, at *11;

13  Amchem, 521 U.S. at 620, 117 S.Ct. at 2248 ("Confronted with a request for settlement-only class

14  certification, a district court need not inquire whether the case, if tried, would present intractable

15  management problems, for the proposal is that there be no trial.") (citation omitted).

16         The only factor in play here weighs in favor of class treatment. Further, the filing of

17  separate suits by several hundred class members "would create an unnecessary burden on

18  judicial resources." Barbosa, 2013 WL 3340939, at *11. Under the circumstances, the court finds

19  that the superiority requirement is satisfied.

20  II.    FAIRNESS, REASONABLENESS, AND ADEQUACY OF THE PROPOSED SETTLEMENT

21         The court's preliminary evaluation of the Settlement Agreement "does not disclose grounds

22  to doubt its fairness[,] . . . such as unduly preferential treatment of class representatives or of

23  segments of the class, or excessive compensation for attorneys, and appears to fall within the

24  range of possible approval[.]" In re Vitamins, 2001 WL 856292, at *4 (quoting Manual for Complex

25  Litigation, Third, § 30.41 (West 1999)).

26         A.     The Settlement Is a Product of Arms-Length Negotiations.

27         "This circuit has long deferred to the private consensual decision of the parties." Rodriguez

28  v. W. Publ'g Corp., 563 F.3d 948, 965 (9th Cir. 2009). The Ninth Circuit has "emphasized" that:

1    the court's intrusion upon what is otherwise a private consensual agreement

2    negotiated between the parties to a lawsuit must be limited to the extent

3    necessary to reach a reasoned judgment that the agreement is not the

4    product of fraud or overreaching by, or collusion between, the negotiating

5    parties, and that the settlement, taken as a whole, is fair, reasonable and

6    adequate to all concerned.

7    Id. (quoting Hanlon, 150 F.3d at 1027).  This Circuit does not follow the approach of other circuits

8    that requires district courts to "specifically weigh[] the merits of the class's case against the

9    settlement amount and quantif[y] the expected value of fully litigating the matter."  Id.  Rather,

10   Ninth Circuit examines whether the settlement is "the product of an arms-length, non-collusive,

11   negotiated resolution[.]"  Id.

12         Plaintiff's Renewed Motion and supporting documents, and the overall record in this case,

13   evidence that the parties' settlement was reached through arms' length negotiation.  There is no

14   evidence of collusion or fraud leading to, or taking part in, the settlement negotiations between the

15   parties.  Plaintiff asserts that the proposed settlement was reached as the result of arm's length

16   negotiations between counsel.  (See Renewed Motion at 7 & 30).  The parties first engaged in

17   settlement discussions in early 2013, when "the Parties made substantial progress toward a

18   proposed resolution through counsel[.]" (Richman Decl. at ¶ 9).  Not having resolved the matter,

19   the parties proceeded with "a private mediation session before third-party neutral John Bates of

20   JAMS to reach agreement."  (Id. at ¶¶ 9-10).  "With the assistance of Mr. Bates, the [p]arties

21   reached an agreement in principle as to the primary terms of a classwide settlement[,] [and it then

22   took] several more months of discussions to finalize all of the ancillary terms and reduce their

23   agreement to writing in the form of their" Settlement Agreement.  (Id. at ¶ 10; Renewed Motion at

24   7 & 8).  Further, it was only "after the [p]arties agreed upon the Settlement Benefits to the Class

25   [that] they negotiate[d] and reach[ed] agreement on the amount of" proposed attorney's fees and

26   an incentive award for plaintiff.  (Richman Decl. at ¶ 11).  A settlement reached through the

27   assistance of a mediator and through a process of several months to finalize the settlement

28   supports a determination that the settlement process was not collusive.  See, e.g., Carter v.

16

1    Anderson Merchandisers, LP, 2010 WL 1946784, *7 (C.D. Cal. 2010) ("The court is . . . satisfied

2    the Settlement Agreement is the product of arms-length negotiation[]" because the settlement was

3    reached through "formal mediation sessions presided over by an experienced mediator[.]").

4          The case record further supports plaintiff's position that the settlement resulted from an

5    arms-length negotiation.   The parties zealously litigated this action and engaged in extensive

6    motion and discovery practice.   It was only after briefing on several substantive motions, oral

7    argument, formal discovery, and negotiations between counsel that the parties engaged in formal

8    mediation and ultimately reached a settlement. (Richman Decl. at ¶¶ 7-9; see Document Nos. 35,

9    41 & 54).   Plaintiff asserts that counsel "had ample information – including expert findings and

10   [plaintiff's] pre-filing investigation – at their disposal . . . to evaluate the terms of any proposed

11   settlement and to reach a fair and reasonable compromise." (See Renewed Motion at 30-31).

12   The parties therefore entered the settlement discussions with a substantial understanding of the

13   factual and legal issues from which they could advocate for their respective positions and which

14   are necessary for a robust negotiation.   See Collins v. Cargill Meat Solutions Corp., 274 F.R.D.

15   294, 302 (E.D. Cal. 2011) (finding arms-lengths negotiations where "[b]oth parties conducted

16   extensive investigation and discovery allowing them to assess the strengths and weaknesses of

17   the case."); Adoma v. Univ. of Phoenix, Inc., 913 F.Supp.2d 964, 977 (E.D. Cal. 2012) (finding

18   settlement to be fair and a result of arms-length negotiation where the parties engaged in formal

19   written discovery and deposition).   In short, the court finds that the parties sufficiently "consider[ed]

20   the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining

21   it[.]"  Rodriguez, 563 F.3d at 965.

22          Finally, the proposed class representative submits evidence that she was advised of, and

23   discussed the settlement agreement with her counsel.   Plaintiff declares that, "based on [her] own

24   review of the [settlement agreement] . . . [and] discussions with [her] counsel," she believes that

25   the proposed terms of the settlement "are more than fair, reasonable and adequate to resolve the

26   claims against Defendant in this case." (Kulesa Decl. at ¶ 10).   The participation of the proposed

27   class representative, then, is further proof that the settlement is a product of an arms-length

28   negotiation.

1    Based on the evidence and record before the court, the court is persuaded that "the

2    agreement is not the product of fraud or overreaching by, or collusion between, the negotiating

3    parties[.]"  Rodriguez, 563 F.3d at 965 (quoting Hanlon, 150 F.3d at 1027).

4         B.    The Amount Offered In Settlement Falls Within a Range of Possible Judicial

5               Approval and Is a Fair and Reasonable Outcome for Class Members.

6         The settlement amount of $10.00 per class member, along with the injunctive-type relief

7    provided by the settlement agreement, is fair, reasonable, and adequate, and falls within a range

8    of possible approval.  The claims in this action are based on allegations that defendant's product

9    failed to provide all of its advertised benefits, (see TAC at ¶ 20), and instead "perform[ed] only two

10   main functions"– cleaning a computer's "operating system registry[,]" and "remov[ing] superfluous

11   'temporary' files from a user's hard drive."  (Id. at ¶ 21).  According to plaintiff, she "seeks to

12   recover damages on behalf of herself and the Class in an amount equal to what they overpaid for

13   the Software Products given their reduced level of functionality."  (Renewed Motion at 2 n. 3).  As

14   explained below, the court agrees with plaintiff that the settlement agreement provides a

15   substantial award to each class member in light of the maximum amount of recovery in this action.

16        "The proper measure of damages in fraud actions under California law . . . is 'out-of-pocket'

17   damages."  In re First Alliance Mortgage Co., 471 F.3d 977, 1001 (9th Cir. 2006).  "'The

18   out-of-pocket measure restores a plaintiff to the financial position he enjoyed prior to the fraudulent

19   transaction, awarding the difference in actual value between what the plaintiff gave and what he

20   received.'"  Id. (quoting Fragale v. Faulkner, 110 Cal.App.4th 229 (2003)).  This measure of

21   damages also applies to plaintiff's breach of warranty claim.  See Guido v. L'Oreal, USA, Inc.,

22   2013 WL 3353857, *14 (C.D. Cal. 2013) ("The measure of damages for breach of warranty is the

23   difference at the time and place of acceptance between the value of the goods accepted and the

24   value they would have had if they had been as warranted[.]"); (see TAC at ¶¶ 89-98).  Here,

25   plaintiff states that a "computer forensics team [determined that] the Software Products at issue

26   . . . provided [only] approximately 50% of the functionality advertised."  (Supplemental Br. at 3).

27   Plaintiff's counsel's declaration provides an overview of the "computing environment and testing

28   performed . . . to evaluate" the PC Cleaner Pro, and "[t]he results of [such] analyses and testing[,]"

1  which formed the basis of counsel's "evaluation of the actual utility" of the software.  (See

2  Declaration of Chandler R. Givens ("Givens Decl.") at ¶ 2).  Based on the "analyses and testing

3  results[,] including assessing the benefits actually provided by the Software in relation to the utility

4  advertised," (id. at ¶¶ 3-8), plaintiff's counsel "determined that the Software Products' value is

5  more reasonably calculated to be $15.00, as opposed to the typical $29.97 purchase price."  (Id.

6  at ¶ 9).  According to this evidence, then, the maximum amount of money that class members can

7  reasonably expect to recover, should they prevail at trial, is $15.00 each.

8         The Settlement Agreement provides that each class member who submits a valid claim will

9  receive a one-time payment of $10.00, which represents 66% of the individual maximum potential

10  recovery.  (See Settlement Agreement at § VI.B.2).  Given the risks and uncertainty to the class

11  members in moving forward to prove their damages before a trier of fact, the total monetary

12  settlement is a substantial recovery.  See Rodriguez, 563 F.3d at 964 (affirming settlement

13  approval where the settlement represented thirty percent of the damages estimated by the class

14  expert); Linney v. Cellular Alaska P'ship., 151 F.3d 1234, 1242 (9th Cir. 1998) ("The fact that a

15  proposed settlement may only amount to a fraction of the potential recovery does not, in and of

16  itself, mean that the proposed settlement is grossly inadequate and should be disapproved.")

17  (internal quotation marks and citation omitted).

18         Moreover, the Settlement Agreement provides class members with significant injunctive-

19  type relief.  All class members, regardless of whether they submit a Claim Form, will be entitled

20  to receive three months of free access to defendant's PC Antivirus Pro 2013 software.

21  (Settlement Agreement at § VI.B.3).  Plaintiff submits that such "antivirus software retails for

22  approximately $30 per six-month license, [and therefore] this component of the Settlement

23  amounts to an additional $15 value to each Settlement Class Member."  (Renewed Motion at 25).

24  The Settlement Agreement further provides that defendant will agree to make significant changes

25  to the software at issue, both by eliminating features complained of in this action and including

26  information to accurately describe the software functions to its users.  (Settlement Agreement at

27  § VI.A).  Thus, the settlement value is greatly enhanced by defendant's agreement to modify its

28  software product to cure the deficiencies challenged in this action, and should effectively bring

finality to this action which the parties have vigorously disputed since its filing. The settlement therefore not only compensates class members for alleged past violations, but also gives due regard to protecting their rights going forward. See Officers, 688 F.2d at 624 ("The primary concern of [Rule 23(e)] is the protection of th[e] class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties.").

For the reasons set forth above, the court is persuaded that the Settlement Agreement's terms and total payment amount are fundamentally fair, adequate and reasonable, and the settlement readily falls within the range of possible approval.

C.   The Court Finds That the Settlement Agreement Does Not Improperly Grant Preferential Treatment to the Class Representative.

1.   **The Incentive Award Does Not Provide Unduly Preferential Treatment to the Class Representative.**

The Settlement Agreement provides for payment of an incentive award not to exceed $2,000 for the class representative. (See Settlement Agreement at § XI.A). The Settlement Agreement contemplates that class counsel will request, and defendants will not oppose, this payment "in recognition of her efforts on behalf of the Settlement Class" in litigating this action. (See id.).

"Although [the Ninth Circuit] ha[s] approved incentive awards for class representatives in some cases, [it has instructed] district courts to scrutinize carefully the awards so that they do not undermine the adequacy of the class representatives." Radcliffe v. Experian Info. Solutions Inc., 715 F.3d 1157, 1163 (9th Cir. 2013) (reversing the district court's class action settlement approval). In Radcliffe, the court cast doubt, but did not rule on, "whether class representatives could be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement value when they would receive $5,000 incentive awards." 715 F.3d at 1165.

In Staton v. Boeing Company, the court reversed the district court's approval of a class-action settlement where the incentive payments of up to $50,000 were disproportionately large as compared to class members' payments averaging $16,500 for one subclass, and $1,000 for another. See 327 F.3d at 948-49, 977. The court cautioned that class representatives

20

1   receiving special incentive awards "may be more concerned with maximizing those incentives than

2   with judging the adequacy of the settlement as it applies to class members at large." Id. at 977.

3   In such cases, "the class representatives [may not] adequately represent the class." Radcliffe,

4   715 F.3d at 1164.

5          The Staton court, however, approvingly cited to Cook v. Niedert, 142 F.3d 1004, 1016 (7th

6   Cir. 1998), in which the Seventh Circuit allowed an incentive payment of $25,000 "in the context

7   of a recovery of more than $14 million[,]" where the plaintiff "spent hundreds of hours with his

8   attorneys and provided them with 'an abundance of information[.]'" Staton, 327 F.3d at 976

9   (quoting Cook, 142 F.3d at 1016). Staton also cited favorably to In re SmithKline Beckman Corp.

10  Sec. Litig., 751 F.Supp.525, 535 (E.D. Pa. 1990), which approved "$5,000 awards for one named

11  representative of each of nine plaintiff classes involving more than 22,000 claimants in a

12  settlement of $22 million[.]"). Staton, 327 F.3d at 977.

13         With this guidance in mind, the court must examine whether there is a "significant disparity

14  between the incentive awards and the payments to the rest of the class members" such that it

15  creates a conflict of interest. See Radcliffe, 715 F.3d at 1165. Further, "[i]n deciding whether [an

16  incentive] award is warranted, relevant factors include the actions the plaintiff has taken to protect

17  the interests of the class, the degree to which the class has benefitted from those actions, and the

18  amount of time and effort the plaintiff expended in pursuing the litigation." Cook, 142 F.3d at 1016.

19

20         The class representative's incentive award of $2,000 represents many times more the

21  amount of the average settlement payment, since each class member who submits a valid Claim

22  Form will receive a payment of $10, and all class members will receive $15 worth of access to

23  defendant's antivirus software. See supra at § II.B. While a disparity exists between the incentive

24  payments and the calculated average class member payment, the court finds that it does not rise

25  to the level of unduly preferential treatment.  First, courts have approved similar or greater

26  disparities between incentive awards and individual class member payments. See, e.g., Cox v.

27  Clarus Marketing Group, LLC, 291 F.R.D. 473, 483 (S.D. Cal. 2013) (court approved a $5,000

28  incentive award where class members would receive a maximum payment of $36); Lo, 2011 WL

1 6300050 at *7 (incentive award of $1,500 was appropriate where individual awards approximated

2 $131.00 and "appear[ed] to be on par with class representative awards in similar class action

3 settlements."); In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 457, 463 (9th Cir. 2000) (affirming

4 incentive award of $5,000 where total settlement fund, including costs and attorney's fees, was

5 $1,725,000 for 5,400 potential class members); see also Fulford v. Logitech, Inc., 2010 WL

6 807448, *3 n. 1 (N.D. Cal. 2010) (collecting cases awarding incentive payments ranging from

7 $5,000 to $40,000).

8         Second, plaintiff submits evidence supporting the adequacy of the incentive payment based

9 on the significant amount of time spent and burden carried by her, and the benefits she provided

10 to counsel and the class as a whole throughout the litigation. See Cook, 142 F.3d at 1016.

11 Plaintiff attests that she has "been actively involved in this matter throughout its pre-filing

12 investigation and pendency, and [has] at all times been willing to devote the time and other

13 resources necessary to appropriately represent both [her]self and the proposed class members

14 in this case." (Kulesa Decl. at ¶ 3).  She was "in regular communication with [her] counsel . . .

15 regarding the case generally, [her] experiences with the Software Products and marketing

16 materials in question[,] and [her] views of the claims at issue." (Id. at ¶¶ 5-6).  Her duties as class

17 representative included providing class counsel with documents and information relating to the

18 claims, reviewing and providing comments on the original and amended complaints and motion

19 documents, providing declarations, and reviewing and discussing with her counsel the Settlement

20 Agreement.  (See id. at ¶¶ 7 & 10).  Plaintiff also attests that "on several occasions [she took time

21 from her] personal and work commitments" to tend to her duties as class representative, and that

22 she remains "ready and willing" to continue to do so. (Id. at ¶ 9).  In sum, plaintiff's evidence

23 establishes that the incentive award is warranted based on her efforts to "protect the interests of

24 the class, the degree to which the class has benefitted from those actions, and the amount of time

25 and effort the plaintiff expended in pursuing the litigation." Cook, 142 F.3d at 1016.

26         **2.    The Incentive Payment Is Not Conditioned On the Class**

27 **Representative's Support of the Settlement**.

28         In Radcliffe, the court reversed approval of a class action settlement because the

1   "conditional incentive awards caused the interests of the class representatives to diverge from the

2   interests of the class because the settlement agreement told class representatives that they would

3   not receive incentive awards unless they supported the settlement."  715 F.3d at 1161.  Here,

4   there is nothing in the Settlement Agreement or otherwise before the court indicating that the class

5   representative's support of the settlement is explicitly or implicitly conditioned on the incentive

6   award.  (See, generally, Settlement Agreement).  Rather, the Settlement Agreement recognizes

7   that the incentive award is "subject to," and must be paid by defendant only upon, court approval.

8   (See Settlement Agreement at § XI.A).  Plaintiff's declaration also states her understanding that

9   she "may ultimately recover nothing" by her participation in this case.  (Kulesa Decl. at ¶ 8).  The

10  court determines that this information suffices for purposes of preliminary approval of the proposed

11  settlement.  However, the court will again scrutinize this requirement in its evaluation of a motion

12  for final approval, and will specifically assess whether plaintiff provides affirmative evidence that

13  her support of the settlement is not conditioned on her receipt of the incentive award.

14          D.      The Settlement Agreement Has No Obvious Deficiencies.

15          District courts have the duty and authority to protect the interests and rights of class

16  members as well as to ensure the "integrity of the settlement approval process."  Hanlon, 150 F.3d

17  at 1025.

18          When the parties appeared before the court on August 9, 2013, on plaintiff's original Motion,

19  the court expressed its concern that the Settlement Agreement's language regarding the claims

20  released by class members was unacceptably ambiguous.  In support of the Renewed Motion,

21  plaintiff submitted an Addendum to Stipulation of Class Action Settlement ("Addendum") executed

22  by the parties which modifies the claims release language to clearly identify and limit the claims

23  released, and also explicitly identify which software products are at issue.  (See Settlement

24  Agreement, Exh. 2, Addendum at § 1).  Having reviewed the amended terms, the court finds that

25  the Addendum sufficiently cures the deficiency of the claims release language identified by the

26  court.

27          E.      Proposed Class Notice and Notification Procedures.

28          Upon settlement of a certified class, "[t]he court must direct notice in a reasonable manner

23

1   to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).   Federal

2   Rule of Civil Procedure 23(c)(2) prescribes the "best notice that is practicable under the

3   circumstances, including individual notice" of particular information.  Fed. R. Civ. P. 23(c)(2)(B)

4   (enumerating notice requirements for classes certified under Rule 23(b)(3)).

5          A class action settlement notice "is satisfactory if it generally describes the terms of the

6   settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

7   forward and be heard." Churchill Vill., L.L.C. v. Gen. Elec., 361 F.3d 566, 575 (9th Cir.), cert.

8   denied, Beckwith Place Ltd. P'ship v. Gen. Elec. Co., 543 U.S. 818 (2004) (internal quotation

9   marks omitted).  "The standard for the adequacy of a settlement notice in a class action under

10  either the Due Process Clause or the Federal Rules is measured by reasonableness." Wal-Mart

11  Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 113 (2d Cir.), cert. denied, Leonardo's Pizza by the

12  Slice, Inc. v. Wal-Mart Stores, Inc., 544 U.S. 1044 (2005).  Settlement notices must "fairly apprise

13  the prospective members of the class of the terms of the proposed settlement and of the options

14  that are open to them in connection with the proceedings." Weinberger v. Kendrick, 698 F.2d 61,

15  70 (2d Cir. 1982), cert. denied, 464 U.S. 818 (1983), (internal quotation marks and brackets

16  omitted); see Trotsky v. L.A. Fed. Sav. & Loan Ass'n., 48 Cal.App.3d 134, 151-52 (1975) (same).

17  "As a general rule, class notice must strike a balance between thoroughness and the need to

18  avoid unduly complicating the content of the notice and confusing class members." Wershba v.

19  Apple Computer, Inc., 91 Cal.App.4th 224, 251 (2001).  The notice should provide sufficient

20  information to allow class members to decide whether they should accept the benefits of the

21  settlement, opt out and pursue their own remedies, or object to its terms.  See id. at 251-52.

22  "[N]otice is adequate if it may be understood by the average class member."  4 Newberg on Class

23  Actions § 11:53, at 167 (4th ed. 2013).

24         Here, the Notice of Proposed Settlement of Class Action ("Class Notice") describes the

25  nature of the action as well as the class claims, issues, and defenses.  (See Notice of Filing of

26  Revised Notice of Proposed Class Action Settlement at Attachment, Notice of Proposed Class

27  Action Settlement ("Class Notice") at ¶¶ 1-2); see Fed. R. Civ. P. 23(c)(2)(B)(i) & (iii).  The class

28  definition is conspicuously included in a section entitled "Who is included in the Settlement?"  (See

Class Notice at ¶ 4); see Fed. R. Civ. P. 23(c)(2)(B)(ii).  The Class Notice explains the terms of the Settlement Agreement, including: (1) the monetary amount that will be paid to each class member who submits a claim; (2) entitlement to three months of free access to defendant's "PC Antivirus Pro 2013" software, regardless of whether a Claim Form is submitted; and (3) the modifications that defendant will make to its antivirus software.  (See Class Notice  at ¶ 5).  It includes an overview and detailed explanation laying out the class members' options under the settlement: they may submit a Claim Form, exclude themselves, object, or do nothing.  (See id. at 1 & ¶¶ 7-9, 12, 13); see Fed. R. Civ. P. 23(c)(2)(B)(v)-(vi).  The Settlement Agreement and Class Notice provide that class members may elect to exclude themselves from the settlement by filling out and submitting a simple "Opt-Out Form" either electronically or by mail.  (See Addendum § III & Exh. E ("Opt-Out Form"); Class Notice at ¶ 7).  The Class Notice also states that if a class member chooses to file an objection to the settlement, he or she may enter an appearance on his or her own behalf or through his or her own attorney.  (See Class Notice at ¶ 8); see Fed. R. Civ. P. 23(c)(2)(B)(iv).  The Class Notice also explains that all members of the Settlement Class will release all claims that relate to the allegations asserted in or contemplated by the lawsuit.  (See id. at ¶ 9; Addendum at § 1); see Fed. R. Civ. P. 23(c)(2)(B)(vii).  Information regarding the final settlement approval hearing is also included.  (See id. at ¶¶ 9-11).  Finally, the Class Notice allows class members a full and fair opportunity to submit a claim for payment.  (See id. at ¶¶ 5 & 12).

The Settlement Agreement provides that the Class Notice will be disseminated to class members by the proposed settlement administrator, Epiq Systems, within 28 days after preliminary approval is granted by this court.  (See Addendum at § II; Settlement Agreement at § II).  The Settlement Agreement explains that, because "the software at issue was sold and delivered electronically, Defendant did not gather address information from purchasers other than zip codes (which were used to verify credit card payments.)" (Id.).  Accordingly, the settlement administrator will disseminate the Class Notice via electronic mail.  (See id.).  "[I]f any notice e-mails remain undeliverable after [a] second attempt at electronic transmission, the Settlement Administrator [will] attempt to obtain the mailing addresses of the . . . Class members via reverse lookup[], . . .

1    [and] will disseminate [the Class Notice] . . . via United States Mail[.]" (Id.).  Notice via postal

2    service for those class members will be accomplished by mailing a "Postcard Notice[.]" (Id.; Notice

3    of Filing of Proposed Postcard Notice Mock-Up in Support of Preliminary Approval of Class Action

4    Settlement at Exh. 1 ("Postcard Notice")).  The parties' proposed Postcard Notice, however, differs

5    substantially from the Class Notice, and contains only a fraction of the information provided by the

6    latter.  The Postcard Notice does not sufficiently apprise class members of the terms of the

7    settlement and of their options as class members, and therefore fails to meet due process

8    requirements.  See Wal-Mart Stores, Inc., 396 F.3d at 113; Churchill Vill., L.L.C., 361 F.3d at 575.

9    Because the proposed Postcard Notice does not provide reasonable notice of the Settlement

10   Agreement to class members, and there appears no justification for the divergence from the Class

11   Notice, the court will not authorize the Postcard Notice.  Rather, for those class members who do

12   not successfully receive notice via electronic mail, the settlement administrator shall mail the Class

13   Notice, Claim Form, and Opt-out Form via the U.S. Postal Service.

14          Finally, the Settlement Agreement requires that the settlement administrator create a

15   website for the settlement "[w]ithin twenty-one . . . days after [issuance of this order], including the

16   form and content of the Settlement Class Notice[.]"  (Settlement Agreement at VIII(B) & VII(B)(4)).

17          Based on the foregoing, the court finds that there is no alternative method of distribution

18   that would be more practicable here, or any more reasonably likely to notify the class members.

19   Under the circumstances, the court finds that the procedure for providing notice and the content

20   of the Class Notice, as discussed above, constitute the best practicable notice to the class

21   members.

22          **This Order is not intended for publication.  Nor is it intended to be included in or**

23   **submitted to any online service such as Westlaw or Lexis.**

24                                    **CONCLUSION**

25          Based on the foregoing, IT IS ORDERED THAT:

26          1.   Plaintiff's Renewed Motion for Preliminary Approval of Class Action Settlement

27   **(Document No. 79)** is **granted** upon the terms and conditions set forth in this Order.

28          2.   The court preliminarily certifies the class, as defined in § II of the Stipulation of Class

Action Settlement ("Settlement Agreement") for the purposes of settlement.

3. The court preliminarily appoints plaintiff Kulesa as Class Representative for settlement purposes.

4. The court preliminarily approves the law firm Edelson LLC as Class Counsel for settlement purposes.

5. The court preliminarily finds that the terms of the proposed Settlement Agreement and Addendum to Stipulation of Class Action Settlement ("Addendum") are fair, adequate and reasonable, and comply with Rule 23(e) of the Federal Rules of Civil Procedure.

6. The proposed manner of the notice of settlement set forth in the Settlement Agreement and Addendum, with the required modifications set forth in this Order, see, supra at II(E), constitutes the best notice practicable under the circumstances and complies with the requirements of Due Process.

7. The Court approves the form, substance and requirements of the Revised Notice of Proposed Class Action Settlement ("Class Notice"); Claim Form, and Opt-out Forms, annexed hereto as Attachments A, B, and C, respectively.

8. The parties shall carry out the settlement according to the terms of the Settlement Agreement.

9. Epiq Systems ("Epiq") is hereby appointed as the Claims Administrator.  Promptly following entry of this order, Epiq will prepare final versions of the Class Notice, Claim Form, and Opt-out Forms, incorporating into them the relevant dates and deadlines set forth in this Order and the Settlement Agreement and Addendum, and will commence the notice process, in accordance with the Settlement Agreement and Addendum.

10. The deadlines for class members to file requests for exclusion, objections to the settlement, and Claim Forms shall be in conformity with the Settlement Agreement and Addendum.  Class Members who wish to receive a settlement payment shall complete, sign and submit their Claim Form in accordance with the instructions contained therein, no later than ninety (90) days after the Class Notice is first disseminated.  Any Class Member may, upon request, be excluded from the settlement by submitting an Opt-out Form, and may submit objections to the

1   settlement,  no later than sixty (60) days after the Class Notice is first disseminated, and as further

2   instructed in the Class Notice and Opt-out Form.

3        11.  A final approval (fairness) hearing is hereby scheduled for **May 29, 2014**, at **10:00 a.m.**

4   in Courtroom 22, to consider the fairness, reasonableness and adequacy of the proposed Joint

5   Stipulation of Settlement as well as the award of attorneys' fees and costs to class counsel, and

6   incentive awards to the class representatives.

7        12.  Plaintiff shall file and serve a motion for final approval of the Joint Stipulation of

8   Settlement no later than **April 28, 2014**, and regularly notice it for hearing under the Local Rules.

9        13.  If any opposition or objection to the motion has been filed, then the parties shall, no

10   later than five (5) court days before the final approval hearing, file, jointly or separately, a reply in

11   support of the motion for final approval of the Joint Stipulation of Settlement.

12        14.  Plaintiff shall file a motion for an award of class representative incentive payment and

13   attorney's fees and costs pursuant to, and in accordance with, the terms of the Settlement

14   Agreement and the court's Local Rules, no later than **April 28, 2014**.

15        15.  If any opposition or objection to the motions for an award of class representative

16   incentive payment and attorney's fees and costs has been filed, then the parties shall, no later

17   than five (5) court days before the final approval hearing, file a reply in support of the motions for

18   an award of class representative incentive payments and attorney's fees and costs.

19   Dated this 10th day of February, 2014.

20                                                          /s/
                                                    Fernando M. Olguin
21                                                  United States District Judge

22

23

24

25

26

27

28