1
2
3
4
5
6 **UNITED STATES DISTRICT COURT**
7 **CENTRAL DISTRICT OF CALIFORNIA**
8

| | |
|---|---|
| VIRGINIA KULESA, individually and on behalf of all others similarly situated, | Case No. SA CV 12-0725 FMO (ANx) |
| Plaintiff, | **ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT, INCENTIVE AWARD, AND ATTORNEY'S FEES** |
| v. | |
| PC CLEANER, INC., a California Corp., | |
| Defendant. | |

Having reviewed and considered all the briefing filed with respect to plaintiff's Motion for Final Approval of Class Action Settlement, Incentive Award and Attorneys' Fees ("Motion"), and the oral argument presented during the final fairness hearing held on May 29, 2014, the court concludes as follows.

## INTRODUCTION

Plaintiff Virginia Kulesa ("plaintiff") filed this consumer product class action against PC Cleaner, Inc. ("PCI" or "defendant") on May 4, 2012, on the ground that it deceptively designed and sold its PC Cleaner Pro software ("software"). (See Complaint at ¶ 2). On January 18, 2013, plaintiff filed a Third Amended Complaint ("TAC") – the operative complaint – alleging claims for: (1) unfair business practices pursuant to California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.; (2) fraudulent inducement; (3) breach of express warranties, Cal. Comm. Code § 2313; (4) breach of contract; and (5) breach of the implied covenant of good faith and fair dealing. (See TAC at ¶¶ 62-115).

This matter first came before the court on August 29, 2013, on plaintiff's Motion for Preliminary Approval of Class Action Settlement ("Motion for Preliminary Approval").  The court did not grant preliminary approval at that time, and instead ordered the parties to file an amended motion with additional briefing and supporting evidence, and an amended proposed class notice and claim form, among other things.  (See Court's Order of August 29, 2013).  Pursuant to the Court's Order of August 29, 2013, plaintiff filed a Renewed Motion For and Memorandum in Support of Preliminary Approval of Class Action Settlement ("Renewed Motion for Prelim. Appr.") on October 4, 2013, as well as a supplemental brief addressing additional issues identified by the Court's Order of November 12, 2013.  (See Court's Order of November 12, 2013; Plaintiffs' Supplemental Briefing in Support of Preliminary Approval of Class Action Settlement).  The court granted preliminary approval on February 10, 2014.  (See Court's Order of February 10, 2014).

By way of the instant Motion, plaintiff seeks of an order (1) granting final approval of the class action settlement; (2) awarding attorney's fees to class counsel; and (3) awarding an incentive payment to plaintiff, as class representative.  (See Motion at 2).

## BACKGROUND

I.     FACTUAL ALLEGATIONS.

This case arises from plaintiff's January 17, 2012, online purchase of defendant's software in an effort to repair problems with her computer.  (See TAC at ¶¶ 42-47).  Plaintiff asserts that she read defendant's "express warranties" on its website, (id. at ¶ 44), and "[r]elying on the representations made[,]" downloaded the software, and then paid "$29.97 to activate her copy of PC Cleaner[.]"  (Id. at ¶¶ 45-47).  Plaintiff alleges that the software "could not and did not perform as advertised by [defendant[,]" and "her computer continued to suffer from the same problems she experienced prior to purchasing and running the software."  (Id. at ¶ 49).

PCI claims that its software "will increase the speed, performance, and stability of a consumer's personal computer, . . . and remove harmful system errors."  (TAC at ¶ 1).  According to plaintiff, "[t]hrough a common deceptive scheme, PCI uniformly deceives consumers into purchasing the . . . software" by, among other things, allowing consumers to use a free trial version which then "purportedly detects errors that lead to" viruses and malware.  (Id. at ¶¶ 3 &

4).  The software then informs the consumer that there are "thousands of harmful errors," and that she must purchase the software to remove the purported errors.  (See id. at ¶ 4).  Plaintiff asserts that, "contrary to [defendant's] marketing and in-software representations, neither the free trial version nor the full registered version of [the software] performs any credible diagnostic testing on the consumer's computer."  (Id. at ¶ 5).  Rather, the software is "designed to always report that a user's computer is severely damaged[,] regardless of the [actual] condition or type of computer the software is installed on."  (Id. at ¶ 31).  Defendant nevertheless represents that its software will repair, clean, secure, and optimize the consumer's computer, when in reality, the software allegedly performs only two functions:  cleaning the registry and removing temporary files.  (See id. at ¶¶ 15-21).  Plaintiff claims that through its software design, and in conjunction with marketing statements about the software's supposed utility, PCI intended to and did induce consumers to pay for the software, thereby defrauding them.  (See id. at ¶¶ 34-38).

II.    MATERIAL TERMS OF THE SETTLEMENT AGREEMENT.

       A.    Class Definition.

       Pursuant to the Settlement Agreement, plaintiffs sought and the court certified, for settlement purposes only, the following class:

              [A]ll individuals and entities residing in the United States and its territories
              that, on or before the date on which the Court enters an order preliminarily
              approving the settlement, purchased any and all versions of the following
              software: PC Cleaner Pro 2011, PC Cleaner Pro 2012 and PC Cleaner Pro
              2013.

(See Court's Order of February 10, 2014, at 3 & 26-27; Stipulation of Class Action Settlement ("Settlement Agreement") at § II).

       B.    Settlement Amount & Benefits.

       The Settlement Agreement primarily entails injunctive-type and in-kind relief to class members.  (See Settlement Agreement at § VI.A).  It requires PCI to modify the current versions of its software products to: (1) eliminate usage of the term "damage level" to refer to the harm posed by detected items during a diagnostic scan, and (2) "[i]nclude accurate in-software

"hoverbox" (i.e., a dialog box displayed when a user rolls over an icon with their mouse) descriptions . . . [that] shall describe the path to in-software links that direct the user to documentation contained on PC Cleaner's website that explains the Software Products' concern levels for the types of items detected through the software's scans." (Id.).  Additionally, each class member will be entitled to receive three months of free access to defendant's PC Antivirus Pro 2013 software.  (See id. at § VI.B.3).

The Settlement Agreement also provides monetary relief to the class, entitling each class member who submits a valid Claim Form to receive a single payment of $10.00.  (Settlement Agreement at § VI.B.2 & Exhibit ("Exh.") B ("Claim Form")).  Defendant also agrees to pay for settlement administration expenses, (see id. at § VII.C), attorney's fees in the amount of $318,000, (see id. at § XI.B), and a $2,000 incentive award to the class representative.  (See id. at § XI.A).

C.    Scope of Release.

Upon final approval of the Settlement Agreement, class members who did not validly opt out of the settlement will release defendant from any claims related to the software at issue in this case, i.e., PC Cleaner Pro 2011, PC Cleaner Pro 2012, and PC Cleaner 2013.  (See Addendum to Stipulation of Class Action Settlement ("Addendum")[1] at § I).

D.    Administration of Claims and Notice to the Class.

Pursuant to the Court's Order of February 10, 2014, granting preliminary approval of the settlement, the parties retained Epiq Systems, Inc. ("Epiq") as the Claims Administrator.  (See Court's Order of February 10, 2014 at 27; Motion at 1; Declaration of Joann Kohl ("Kohl Decl.") at ¶ 4).  Epiq was responsible for, among other things, emailing the Notice of Proposed Class Action Settlement ("Notice") to class members; obtaining names and addresses associated with emails that "bounced back" and then mailing the Notice and Claim Form (collectively, "Claim Package") to class members; and establishing and maintaining a website and toll-free number for

_____

[1]  The Addendum and Settlement Agreement will be referred to as "Settlement Agreement" unless otherwise noted.

1   the dissemination of settlement-related information.  (See Kohl Decl. at ¶ 4).  Notice to class

2   members was accomplished primarily via email.  (See Motion at 10-11; Kohl Decl. at ¶¶ 7-19).

3   Epiq received an electronic list containing 631,961 names and email addresses of individuals who

4   were identified by defendant as having purchased defendant's products during the relevant time

5   period.[2]  (See Kohl Decl. at ¶ 8).  A Class List of 568,192 resulted after Epiq removed duplicate

6   email addresses.  (See id.).

7          On March 10, 2014, Epiq emailed the Notice to 568,013[3] potential class members using

8   methods designed to increase delivery and evade spam filters, and included the following

9   language in the subject line: "Legal Notice Regarding Class Settlement."  (Kohl Decl. at ¶¶ 10-15).

10  The substance and form of the Notice is consistent with the Court's Order of February 10, 2014.

11  (See Court's Order of February 10, 2014, at 27 & Attachment ("Attach.") A; Kohl Decl. at Exh. C

12  (Notice)).

13         Ultimately, 185,395 of the Notices were undeliverable via email.  (See Kohl Decl. at ¶ 16).

14  With respect to those email accounts and the email accounts that had previously requested not

15  to receive emails, Epiq used a third party "Reverse Lookup" service to obtain current names and

16  physical addresses.  (See id. at ¶ 17).  After removing duplicates, 155,940 unique name and

17  address combinations were located.  (See id. at ¶ 18).  On April 1, 2014, Epiq mailed a Claim

18  Package to those consumers.  (See id. at ¶ 19).  As of April 25, 2014, 13,598 Claim Packages

19  were returned as undeliverable, (see id.), and after securing updated addresses from the U.S.

20  Postal Service, Epiq re-mailed the Claim Package to 3,326 consumers.  (See id.).

21         Epiq also established and maintained a settlement-related website, which contains the

22  Notice, Claim Form, Opt-Out Form, Settlement Agreement, Addendum, TAC, and the Court's

23  Order of February 10, 2014.  (See Kohl Decl. at ¶ 24).  Class members could submit a Claim Form

24

25     [2]  The list was over-inclusive because due to defendant's error in tracking sales of specific
    products, it included consumers who purchased products other than those at issue in this litigation.

26  (See Declaration of Cashier Myricks in Support of Preliminary Approval of Class Action Settlement
    at ¶¶ 2-4; Motion at 10 n. 8).

27

28     [3]  Epiq excluded 179 email accounts that had previously requested not to receive emails.  (See
    Kohl Decl. at ¶ 9).

1  or Opt-Out Form via the website.  (See id.).  The website also included answers to frequently

2  asked questions, and a list of key dates and deadlines.  (See id.).  As of April 25, 2014, there have

3  been more than 68,000 "hits" to the website.  (See id.).

4     Additionally, Epiq established and maintained a toll-free phone number to provide

5  information to class members regarding the settlement.  (See Kohl Decl. at ¶¶ 25-26).  As of April

6  25, 2014, callers to the toll-free number have utilized more than 20 hours of Interactive Voice

7  Response time.  (See id.).  Finally, a post office box was rented to receive communications from

8  class members.  The address of the post office box was included in the Notice and available on

9  the settlement website.  (See id. at ¶ 27).

10     As of June 12, 2014, Epiq has received 3,799 Claim Forms, (see Plaintiff's Supplemental

11  Submission in Support of Final Approval of Class Action Settlement ("Supp. Submission"), Exh.

12  1 (Declaration of JoAnn Kohl) ("Supp. Kohl Decl.") at ¶ 3), 348 requests for exclusion,[4] (see id. at

13  ¶ 4), and no objections.  (See id. at ¶ 5).  In addition, three objections or requests for exclusion

14  were sent directly to the court.  (See Court's Order of April 22, 2014; Court's Order of April 23,

15  2014).

16  **LEGAL STANDARD**

17     Federal Rule of Civil Procedure 23[5] provides that "the claims, issues, or defenses of a

18  certified class may be settled . . . only with the court's approval."  Fed. R. Civ. P. 23(e).  "The

19  primary concern of [Rule 23(e)] is the protection of th[e] class members, including the named

20  plaintiffs, whose rights may not have been given due regard by the negotiating parties."  Officers

21  for Justice v. Civil Service Com., 688 F.2d 615, 624 (9th Cir. 1982), cert. denied 459 U.S. 1217

22  (1983).  Whether to approve a class action settlement is "committed to the sound discretion of the

23  trial judge[,]" Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir.), cert. denied, Hoffer

24  v. City of Seattle, 506 U.S. 953 (1992) (internal quotation marks and citation omitted), who must

25

26    [4]  Three of the requests for exclusion were duplicate, and 19 were received from individuals

27  who also submitted Claim Forms.  (See Supp. Kohl Decl. at ¶ 4).

28    [5]  All "Rule" references are to the Federal Rules of Civil Procedure.

examine the settlement for "overall fairness." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998).  The court does not "have the power to delete, modify, or substitute provisions in the negotiated settlement agreement.  The settlement must stand or fall in its entirety." Id. (internal quotation marks and citation omitted).

In order to approve a settlement agreement in a class action, the court must conduct a three-step inquiry.  First, it must assess whether defendant has met the notice requirements under the Class Action Fairness Act ("CAFA"). See 28 U.S.C. § 1715(d).  Second, it must determine whether the notice requirements of Rule 23(c)(2)(B) have been satisfied.  Finally, it must conduct a hearing to determine whether the Settlement Agreement is fair, reasonable, and adequate. See Fed. R. Civ. P. 23(e)(2); Staton v. Boeing Co., 327 F.3d 938, 959 (9th Cir. 2003); Adoma v. Univ. of Phoenix, Inc., 913 F.Supp.2d 964, 972 (E.D. Cal. 2012) (conducting three-step inquiry).

In determining whether a settlement agreement is fair, reasonable, and adequate, the court must weigh some or all of the following factors:  "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 946 (9th Cir. 2011).

In addition, when "a settlement agreement is negotiated *prior* to formal class certification, consideration of these eight . . . factors alone is not enough to survive appellate review." Bluetooth, 654 F.3d at 946 (emphasis in original).  This is because, "[p]rior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement." Id.  District courts, therefore, must determine "that the settlement is not the product of collusion among the negotiating parties." Id. at 947 (internal quotation marks omitted).  In making that determination, courts should look for signs of collusion, including "(1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded[;]" (2) "when the parties negotiate a clear sailing arrangement providing for the payment of attorneys' fees separate and apart from the class

1  funds[;]" and (3) "when the parties arrange for fees not awarded to revert to defendants rather than

2  added to the class fund[.]"  Id. (internal quotation marks and citations omitted).

3  **DISCUSSION**

4  I.  FINAL APPROVAL OF CLASS SETTLEMENT.

5       A.  Class Action Fairness Act.

6       When a settlement is reached in a class action, CAFA requires that, "[n]ot later than 10

7  days after a proposed settlement of a class action is filed in court, each defendant that is

8  participating in the proposed settlement shall serve [notice of the proposed settlement] upon the

9  appropriate State official of each State in which a class member resides and the appropriate

10  Federal official[.]"  28 U.S.C. § 1715(b).  The statute provides detailed requirements for the

11  contents of such a notice.  See id.  The court is precluded from granting final approval of a class

12  action settlement until the CAFA notice requirement is met.  "An order giving final approval of a

13  proposed settlement may not be issued earlier than 90 days after the later of the dates on which

14  the appropriate Federal official and the appropriate State official are served with the notice

15  required under [28 U.S.C. § 1715(b)]."  28 U.S.C. § 1715(d).

16       Here, the parties filed the proposed Settlement Agreement with the court on July 16, 2013,

17  (see Motion for Preliminary Approval), and then filed the Addendum on October 4, 2013.  (See

18  Renewed Motion  for Prelim. Appr.).  CAFA Notice was provided on July 26, 2013, and October

19  4, 2013, to the Attorney General of the United States and to the Attorneys General of each state

20  with respect to each filing.  (See Kohl Decl. at ¶¶ 5-6).  The parties did not receive any objections.

21  (See Motion at 22).[6]  The court, therefore, finds that defendant complied with CAFA's notice

22  requirement.  See  28 U.S.C. 1715(b).

23       B.  Class Certification.

24       In its order granting preliminary approval, the court certified the class referenced above

25  pursuant to Rule 23(b)(3).  (See Court's Order of February 10, 2014, at 26-27).   Because

26

27  _____

28       [6]  Counsel for the parties confirmed at the final fairness hearing that no objections had been
received.

8

1   circumstances have not changed, and for the reasons set forth in its Order of February 10, 2014,

2   the court reconfirms its order certifying the class for settlement purposes under Rule 23(e).  See

3   In re Apollo Group Inc. Sec. Litig., 2012 WL 1378677, *4 (D. Ariz. 2012) ("The Court has

4   previously certified, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and hereby

5   reconfirms its order certifying a class.").

6            C.      Rule 23(c) Notice Requirements.

7            Class actions brought under Rule 23(b)(3) must satisfy the notice provisions of Rule

8   23(c)(2), and upon settlement of a certified class, "[t]he court must direct notice in a reasonable

9   manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).

10  Rule 23(c)(2) prescribes the "best notice that is practicable under the circumstances, including

11  individual notice" of particular information.  Fed. R. Civ. P. 23(c)(2)(B) (enumerating notice

12  requirements for classes certified under Rule 23(b)(3)).

13           The court previously determined that the substance and form of the class notice and related

14  forms were adequate under Fed. R. Civ. P. 23(c)(2).  (See Court's Order of February 10, 2014,

15  at 23-26).  Also, as discussed above, see supra, at § II.D., Epiq disseminated the Notice to class

16  members primarily via email, and to those for which email addresses were not valid, Epiq sent the

17  Notice via U.S. Mail.  According to Epiq, "notice has been delivered successfully to 94.4% of the

18  individuals contained on the Class List[,]" (Kohl Decl. at ¶ 20); (see also Motion at 9) (citing

19  Federal Judicial Center's "Judges' Class Action Notice and Claims Process Checklist and Plain

20  Language Guide" ("It is reasonable to reach between 70%-95% of the class.")).

21           Accordingly, based on its prior findings and the record before it, the court finds that the

22  Notice and the notice process fairly and adequately informed class members of the nature of the

23  action, the terms of the settlement, the effect of the action and release of claims, their right to

24  exclude themselves from this action, and their right to object to the proposed settlement.  (See

25  Court's Order of February 10, 2014, at 27; see, generally, Kohl Decl.; Supp. Kohl Decl.).

26

27

28

D.   Whether Class Settlement is Fair, Reasonable, and Adequate Pursuant to Rule 23(e).

1.   **The Strength of Plaintiff's Case, and the Risk, Expense, Complexity, and Duration of Further Litigation.**

In evaluating the strength of the case, the court should assess "objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." Adoma, 913 F.Supp.2d at 975 (internal quotation marks omitted). "In assessing the risk, expense, complexity, and likely duration of further litigation, the court evaluates the time and cost required." Id. at 976.

Although plaintiff and her counsel are confident regarding the strength of plaintiff's claims, they recognize the "significant risk that continued litigation would diminish or eliminate recovery for [plaintiff] and the Class." (Declaration of Benjamin H. Richman in Support of Final Approval of Class Action Settlement, Incentive Award and Attorneys' Fees ("Richman Decl.") at ¶ 19). For instance, although plaintiff's expert confirmed the strength of the claims through forensic testing, defendant raised several legal challenges to those claims, including that defendant "disclaimed any warranties with respect to the design and functionality of the Software and that [plaintiff and the class] are not entitled to injunctive relief because there is no risk of future harm." (Id.). Class counsel, moreover, recognized that further litigation "would have been expensive and time consuming and require[] additional discovery, expert testing and analysis" since class recovery would have "ultimately turned on the resolution of several complicated factual issues regarding the underlying source code, design and functionality of the [software at issue.]" (Id.). Recovery would also have been delayed by the likely appeal of an adverse finding. (See id.). The court agrees with plaintiff's position that the settlement avoids the risk of reduced or non-recovery and additional costs. See Barbosa v. Cargill Meat Solutions Corp., 297 F.R.D. 431, 446 (E.D. Cal. 2013) ("The settlement, therefore, provides Class Members with another significant benefit that they would not receive if the case proceeded – certain and prompt relief."); In re Portal Software, Inc. Sec. Litig., 2007 WL 4171201, *3 (N.D. Cal. 2007) (noting that the "inherent risks of proceeding to summary judgment, trial and appeal also support the settlement"); Nat'l Rural

Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 526 (C.D. Cal. 2004) ("In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.") (quoting Newberg, Newberg on Class Actions, § 11:50 at 155 (4th ed. 2002)); Oppenlander v. Standard Oil Co., 64 F.R.D. 597, 624 (D. Colo. 1974) ("It has been held proper to take the bird in hand instead of a prospective flock the bush.") (internal quotation marks omitted).  In short, the court finds that these factors support a finding that the Settlement Agreement is fair, adequate, and reasonable.

2.  **The Risk of Maintaining Class Action Status Through Trial.**

Since plaintiff had not yet filed a motion for class certification, there was a risk that it would not be certified.  (See Motion at 15-16).  Accordingly, this factor weighs in favor of approving the settlement.  See Gardner v. GC Services, LP, 2012 WL 1119534, *4 (S.D. Cal. 2012) (noting that "because settlement was reached prior to a hearing on Plaintiff's motion for class certification, settlement was reached at a time when there was still a risk that the class would not be certified by the Court.").

3.  **The Amount Offered in Settlement.**

In granting preliminary approval of the Settlement Agreement, the court concluded that "the settlement agreement provides a substantial award to each class member in light of the maximum amount of recovery in this action."  (Court's Order of February 10, 2014, at 18).  The court found that because the software product was valued at $15.00 rather than the $29.97 purchase price, (see id. at 19), a monetary award of $10.00 "represents 66% of the individual maximum potential recovery."  (Id.); see In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000) (holding that "the [s]ettlement amount of almost $2 million was roughly one-sixth of the potential recovery, which, given the difficulties in proving the case, [was] fair and adequate."); Rodriguez v. West Publ'g. Corp., 563 F.3d 948, 964-65 (9th Cir. 2009) (affirming settlement approval where the settlement represented 30% of the damages estimated by the class expert); Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir. 1998) ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.") (internal quotation marks and

1  citation omitted).  "[T]he very essence of a settlement is compromise, a yielding of absolutes and

2  an abandoning of highest hopes."  Linney, 151 F.3d at 1242 (internal quotation marks omitted).

3  The monetary award to each class member is in addition to the substantial injunctive and in-kind

4  relief provided for by the settlement, including the provision of three months of free access to

5  defendant's PC Antivirus Pro software, which plaintiff values at $15.00.  (See Court's Order of

6  February 10, 2014, at 19).  In short, this factor also weighs in favor of approval.

7                    4.     **The Extent of Discovery Completed and Stage of Proceedings.**

8          "A settlement following sufficient discovery and genuine arms-length negotiation is

9  presumed fair."  Nat'l Rural Telecomms., 221 F.R.D. at 528.  "A court is more likely to approve a

10  settlement if most of the discovery is completed because it suggests that the parties arrived at a

11  compromise based on a full understanding of the legal and factual issues surrounding the case."

12  Id. at 527 (internal quotation marks and citation omitted).  However, "as long as the parties have

13  sufficient information to make an informed decision about settlement, formal discovery is not a

14  necessary ticket to the bargaining table."  Gardner, 2012 WL 1119534, at *5 (internal quotation

15  marks omitted).  The court previously examined these factors and determined that the parties'

16  settlement was the product of arms-length negotiation after engaging in extensive motion and

17  discovery practice.  (See Court's Order of February 10, 2014, at 17).  Accordingly, this factor also

18  warrants approval of the settlement.

19                    5.     **The Experience and Views of Counsel.**

20          "Great weight is accorded to the recommendation of counsel, who are most closely

21  acquainted with the facts of the underlying litigation.  This is because the parties represented by

22  competent counsel are better positioned than courts to produce a settlement that fairly reflects

23  each party's expected outcome in the litigation."  Nat'l Rural Telecomms., 221 F.R.D. at 528

24  (internal quotation marks and citation omitted).  The court determined that class counsel were

25  competent in its order preliminarily approving the settlement, based on evidence that class counsel

26  were experienced in class actions, including consumer fraud cases concerning computer software,

27  and had frequently been appointed lead class counsel by courts throughout the nation.  (See

28  Court's Order of February 10, 2014, at 11-12).  Class counsel recommend approval of the

Settlement Agreement.  (See Richman Decl. at ¶¶ 19-20).  Based on counsel's representations and this court's prior determination regarding the competency of class counsel, the court finds that this factor supports approval of the Settlement Agreement.

              6.    **The Presence of a Government Participant**.

There is no government participant in this matter.  Accordingly, this factor is not relevant. See Wren v. RGIS Inventory Specialists, 2011 WL 1230816, *10, supplemented by 2011 WL 1838562 (N.D. Cal. 2011) (noting that lack of government entity involved in case rendered this factor inapplicable to the analysis).

              7.    **The Reaction of Notified Class Members to the Proposed Settlement**.

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."  Nat'l Rural Telecomms., 221 F.R.D. at 529.  Here, of the 528,286 class members who were provided with notice of the settlement, (see Kohl Decl. at ¶ 20), 3,799 submitted timely Claim Forms, (Supp. Kohl Decl. at ¶ 3), and 345 have opted-out.  (See id. at ¶ 4); see also Larsen v. Trader Joe's Company, 2014 WL 3404531, *5 (N.D. Cal. 2014) ("The fact that some members opted out . . . indicates that the class members read the notice and understood the settlement, such that they were able to make an informed decision whether to participate.").

Although Epiq states that no formal objections have been received, (see Supp. Kohl Decl. at ¶ 5), the court received three objections or requests for exclusion directly from class members. One class member did not specifically object to the settlement  or the settlement terms, but merely objected to being identified and included within the class and did not want his name associated with the litigation.  (See, generally, April 15, 2014, Letter from M.L.G., MD).[7]  Celestine D. Tiller, however, objects to the $10.00 monetary relief, which she characterizes as a "pittance[.]"  (See April 9, 2014, Letter from Celestine D. Tiller ("Tiller Obj.") at 2).  It appears that Ms. Tiller's objections are directed at the software at issue in this litigation, and another unrelated software

---

[7]  Accordingly, Dr. M.L.G. will not be deemed an objector for purposes of this order.

product she purchased from defendant. (<u>See</u> <u>id.</u>). However, according to class counsel, Ms. Tiller has confirmed that "she believes the $10 monetary payment available under the Settlement is appropriate with respect to the" software at issue. (Richman Decl. at ¶ 17). Similarly, Laryn VanOpstall objects primarily to the $10 monetary relief offered by the settlement because it "is less than half the price [she] spent to obtain [the] software[.]" (<u>See</u> Undated Letter from Laryn VanOpstall ("VanOpstall Obj.")).

Although the objectors are understandably disappointed in not receiving 100% recovery of their losses, the court believes the settlement provides a significant recovery for the class as a whole. <u>See</u> <u>Linney</u>, 151 F.3d at 1242 ("[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.") (internal quotation marks omitted). Further, given that there were only two objections to the settlement, the court finds that this factor weighs in favor granting final approval of the settlement. <u>See</u> <u>Nat'l Rural Telecomms.</u>, 221 F.R.D. at 529.

     E.    <u>Whether the Settlement Is the Product of Collusion</u>.

Because the parties negotiated and reached a settlement prior to formal certification of the class, the court must ensure that the settlement was not the product of collusion. <u>See</u> <u>Bluetooth</u>, 654 F.3d at 947-48. In granting preliminary approval of the settlement, the court carefully scrutinized the settlement and concluded that there "was no evidence of collusion or fraud leading to, or taking part in, the settlement negotiations between the parties." (<u>See</u> Court's Order of February 10, 2014, at 16).

With the <u>Bluetooth</u> "signs" of collusion in mind, the court notes that, unlike <u>Bluetooth</u>, where the class received no monetary award, class members here will be receiving monetary relief, (<u>see</u> Settlement Agreement at § VI.B.2), which the court previously deemed substantial "in light of the maximum amount of recovery in this action." (<u>See</u> Court's Order of February 10, 2014, at 18). Moreover, although the attorney's fees negotiated as part of the Settlement Agreement are to be paid "separate and apart from class funds," this concern is mitigated by the fact that as discussed more fully below, <u>see</u> <u>infra</u> at § II, class counsel have not received "red-carpet treatment on fees." <u>See</u> <u>Bluetooth</u>, 654 F.3d at 947 (internal quotation marks omitted). The attorney's fees were

1   clearly disclosed to class members in the Notice,  (see Notice at 4), and neither objector objected

2   to such fees.  (See, generally, Tiller Obj.; VanOpstall Obj.).  Finally, because there is no common

3   fund, no unclaimed funds will revert to defendant.  (See, generally, Settlement Agreement).

4        In short, there are no signs of collusion in the negotiation of the Settlement Agreement.

5   Indeed, the Settlement Agreement provides substantial relief for the class and was reached via

6   arms-length negotiations with the assistance of a mediator.  (See Richman Decl. at ¶¶ 10-11); see

7   also In re HP Laser Jet Litigation, 2011 WL 3861703, *4 (C.D. Cal. 2011) (finding that although

8   Bluetooth warning signs were present, while not dispositive, the fact "that the parties appeared

9   before a neutral third party mediator" supported "a finding of non-collusion.").  Thus, the court finds

10  that the settlement is fair, reasonable, and adequate, and not the product of collusion among the

11  parties.

12  II.    AWARD OF ATTORNEY'S FEES.

13       The Settlement Agreement provides that defendant will not object to a fee award to class

14  counsel of up to $318,000, inclusive of fees and expenses.  (See Settlement Agreement at § XI.B).

15       Rule 23(h) provides that, "[i]n a certified class action, the court may award reasonable

16  attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."

17  Fed. R. Civ. P. 23(h).  "Courts have an independent obligation to ensure that the award, like the

18  settlement itself, is reasonable, even if the parties have already agreed to an amount." Bluetooth,

19  654 F.3d at 941.  However, "since the proper amount of fees is often open to dispute and the

20  parties are compromising precisely to avoid litigation, the court need not inquire into the

21  reasonableness of the fees at even the high end with precisely the same level of scrutiny as when

22  the fee amount is litigated." Staton, 327 F.3d at 966.

23       Courts have discretion to choose among two different methods for calculating a reasonable

24  attorney's fee award.  See Bluetooth, 654 F.3d at 941.  However, such "discretion must be

25  exercised so as to achieve a reasonable result." Id. at 942.  Under the percentage-of-the-fund

26  method, the "court simply awards the attorneys a percentage of the fund sufficient to provide class

27  counsel with a reasonable fee." Hanlon, 150 F.3d at 1029.  This method is typically used when

28  a common fund is created.  See Bluetooth, 654 F3d. at 942.  The Ninth Circuit "has established

1  25% of the common fund as a benchmark award for attorneys fees."  Id.

2  Under the lodestar method, the court multiplies the number of reasonable hours expended

3  by a reasonable hourly rate.  See Hanlon, 150 F.3d at 1029.  Once the lodestar has been

4  determined, the "figure may be adjusted upward or downward to account for several factors

5  including the quality of the representation, the benefit obtained for the class, the complexity and

6  novelty of the issues presented, and the risk of nonpayment."  Id.  The lodestar method is typically

7  utilized when the relief obtained is "not easily monetized," such as when injunctive relief is sought.

8  See Bluetooth, 654 F.3d at 941.

9  Here, because the settlement does not create a common fund, and provides primarily in-

10  kind and injunctive type relief, the court finds that the lodestar method is appropriate.  See Grays

11  Harbor Adventist Christian School v. Carrier Corp., 2008 WL 1901988, *1 (W.D. Wash. 2008)

12  ("Because the attorneys' fees will be paid separately by [defendant] without reducing the relief

13  available to the Class, the lodestar method is appropriate").

14  A.  Lodestar Figure.

15  Class counsel provide the following figures to support the requested fees:

16
| Attorney | Experience (yrs) | Hourly Rate | Hours | Total |
|---|---|---|---|---|
| Partner I | 18 | $685 | 48.3 | $33,085.50 |
| Partner II | 9 | $570 | 89.5 | $51,015.00 |
| Partner III | 5 | $450 | 245.3 | $110,385.00 |
| Associate I | 3 | $350 | 149.2 | $52,220.00 |
| Associate II | 2 | $335 | 48.9 | $16,381.50 |
| Law Clerks | n/a | $215 | 137.3 | $29,519.50 |
|  |  | Total | 718.5 | $292,606.50 |

23  The $292,606.50 lodestar figure is based on 718.5 total hours.[8]  (See Richman Decl. at ¶

24

25  _____

26  [8]  Class counsel represent that they have reduced duplicative and excessive hours.  (See
Richman Decl. at ¶ 25 n. 2); see Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939-

27  40 (1983) ("Counsel . . . should make a good faith effort to exclude from a fee request hours that
are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically

28  is obligated to exclude such hours from his fee submission.").

25).  The court finds that the lodestar figure is reasonable.  As an initial matter, the total hours expended appears reasonable given that "[t]he parties zealously litigated this action and engaged in extensive motion and discovery practice."  (Court's Order of February 10, 2014, at 17); see also Fox v. Vice, 131 S.Ct. 2205, 2216 (2011) ("[T]rial courts need not, and indeed should not, become green-eyeshade accountants.  The essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection.  So trial court may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.").  Moreover, class counsel state that the "rates used to calculate . . . the lodestar are comparable to those charged by attorneys with equivalent experience, skill and reputation for similar services in the Chicago and Los Angeles legal markets," and "have previously been approved by courts in this District, this Circuit, and nationwide."  (See Richman Decl. at ¶ 26); see Chalmers v. City of Los Angeles, 796 F.2d 1205, 1210 (9th Cir. 1986) ("[T]he district court must determine a reasonable hourly rate considering the experience, skill, and reputation of the attorney requesting fees."); Shames v. Hertz Corp., 2012 WL 5392159, *18 (S.D. Cal. 2012) ("A reasonable hourly rate is typically based upon the prevailing market rate in the community for similar work performed by attorneys of comparable skill, experience, and reputation.") (internal quotation marks omitted); Adoma, 913 F.Supp.2d at 983 ("The relevant legal community in the lodestar calculation is generally the forum in which the district court sits.").  Additionally, the hourly rates "are the same as those charged to [class counsel's] hourly-paying clients."  (Richman Decl. at ¶ 27); see, e.g., Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 551, 130 S.Ct. 1662, 1672 (2010) (observing that 'the lodestar method produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case."); Struble v. Fallbrook Union High Sch. Dist., 2012 WL 4109157, *5 (S.D. Cal. 2012) (noting that hourly rate actually charged to clients "is prima facie evidence that . . . rate . . . was reasonable, and a rate the market would bear").

B.   Lodestar Enhancement.

Class counsel seek a multiplier of 1.08 as an enhancement to the lodestar figure, contending that it is warranted under the circumstances of this case.  (See Motion at 28).  "The

17

purpose of [a] multiplier is to account for the risk Class Counsel assumes when they take on contingent-fee cases." Hopkins v. Stryker Sales Corp., 2013 WL 496358, *4 (N.D. Cal. 2013). Factors courts consider in determining whether to adjust the lodestar upward or downward "includ[e] the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment[.]" Hanlon, 150 F.3d at 1029. Considering these factors, a multiplier of 1.08 is reasonable.

The most significant factor in the analysis "is the benefit obtained for the class." Bluetooth, 654 F.3d at 942. The court previously concluded that "the settlement agreement provides a substantial award to each class member in light of the maximum amount of recovery in this action." (Court's Order of February 10, 2014, at 18). Significantly, class members are entitled to "a one-time payment of $10.00, which represents 66% of the individual maximum potential recovery[,]" (id. at 19), as well as $15.00 in in-kind relief in the form of three months of free access to defendant's PC Antivirus Pro 2013 software.[9] (See id.). The value of the settlement is further enhanced by defendant's agreement to modify its software product to cure the deficiencies challenged in this action. (See id.).

With respect to the last factor,[10] the lodestar enhancement "reflect[s] the risk of non-payment[,]" Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1051 (9th Cir.), cert. denied, 537 U.S. 1018 (2002) (internal quotation marks omitted), and "mirrors the established practice in the private legal market of rewarding attorneys for taking the risk of nonpayment by paying them a premium over their normal hourly rates for winning contingency cases." Id. Here, class counsel prosecuted this action on a contingency basis, (see Motion at 32), and have advanced $8,923.02 in unreimbursed expenses.[11] (See Richman Decl. at ¶ 24). Class counsel have represented plaintiff

---

[9] This software is defendant's flagship product and is not at issue in this lawsuit. (See Motion at 2 n.4).

[10] For the reasons set forth in the Court's Order of February 10, 2014, and supra at § I.D, the court finds that the first and third factors also support the requested lodestar enhancement.

[11] Class counsel, however, are not seeking a separate award of expenses. (See Motion at 27 n. 16).

1   and the class "without compensation and requiring that other work be forgone." (Id. at ¶ 23).

2   Moreover, they recognize that "the risk of recovering nothing . . . was significant given the complex

3   factual and legal questions at issue and [defendant]'s ability and willingness to vigorously defend"

4   this action. (Id. at ¶ 26).

5       The contingent nature of the work performed by class counsel also weighs in favor of

6   granting the requested multiplier. See Vizcaino, 290 F.3d at 1051 n.6 (recognizing that courts

7   apply multipliers of 1.0 to 4.0 in 83% of cases surveyed); Parkinson v. Hyundai Motor America,

8   796 F.Supp.2d 1160, 1170 (C.D. Cal. 2010) (observing that "multipliers may range from 2 to 4 or

9   even higher") (internal quotation marks omitted); Hopkins, 2013 WL 496358, at *4 ("Multipliers of

10  1 to 4 are commonly found to be appropriate in complex class action cases."). Applying a

11  multiplier of 1.08 to the lodestar of $292,606.50, yields an award of $316,015.02.[12]

12  III.   INCENTIVE PAYMENT.

13      Plaintiff requests that the court grant an incentive award to Class Representative Virginia

14  Kulesa in an amount of $2,000. (See Motion at 35-36; Settlement Agreement at § XI.A).

15      In its Order of February 10, 2014, the court undertook a thorough examination of the

16  fairness and adequacy of the incentive payment at issue, applying the careful scrutiny required

17  in this Circuit. (See Court's Order of February 10, 2014, at 20-23; see also Radcliff v. Experian

18  Info. Solutions Inc., 715 F.3d 1157, 1163 (9th Cir. 2013) (reversing the district court's class action

19  settlement approval and instructing "district courts to scrutinize carefully the awards so that they

20  do not undermine the adequacy of the class representatives."); Staton, 327 F.3d at 948-49. Based

21  on its review of the record, the court determined "that the incentive award is warranted based on

22  [plaintiff's] efforts to protect the interests of the class, the degree to which the class has benefitted

23  from those actions, and the amount of time and effort the plaintiff expended in pursuing the

24  litigation." (Court's Order of February 10, 2014, at 22) (internal quotation marks omitted); see also

25

26      [12]   There is a discrepancy between this figure, and the $318,000 that class counsel are
27  seeking. (See Motion at 27). Because class counsel do not show how they arrived at the
    $318,000 figure, the court will award the amount arrived at after applying the 1.08 multiplier to the
28  lodestar.

Supp. Submission, Exh. 2 (Declaration of Virginia Kulesa in Support of Final Approval of Class Action Settlement) ("Kulesa Decl.") at ¶¶ 3-7 & 10-11). Moreover, Kulesa states that "while I understand that I may ultimately be awarded an incentive payment for my participation as the named-plaintiff and Class Representative in this matter, the possibility of such an award was not and is not what motivated me to file and proceed with this case. Nor was my potential receipt of such an award conditioned upon my support for the Settlement now before the Court." (Kulesa Decl. at ¶ 9). Significantly, no class member has objected to the requested incentive payment. (See, generally, Motion at 35-36; Tiller Obj.; VanOpstall Obj.). The court, therefore, concludes the incentive payment requested by plaintiff is fair and reasonable, and will be approved.

**This Order is not intended for publication. Nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1. Plaintiff's Motion for Final Approval of Class Action Settlement, Incentive Award and Attorneys' Fees (**Document Nos. 98 & 100**) is **granted** as set forth herein.

2. The court hereby grants final approval to the parties' Stipulation of Class Action Settlement **(Document No. 98-1)** and Addendum to Stipulation of Class Action Settlement **(Document No. 98-2)** (collectively, "Settlement Agreement"). The court finds that the Settlement Agreement is fair, reasonable and adequate, appears to be the product of arm's length and informed negotiations, and treats all members of the class fairly. The parties are ordered to perform their obligations pursuant to the Settlement Agreement.

3. The following settlement class is certified under Federal Rule of Civil Procedure 23(c):

   [A]ll individuals and entities residing in the United States and its territories that, on or before the date on which the Court enters an order preliminarily approving the settlement, purchased any and all versions of the following software: PC Cleaner Pro 2011, PC Cleaner Pro 2012 and PC Cleaner Pro 2013.

4. All class members who did not validly and timely request exclusion from the settlement

have released claims against defendant, as set forth in the Settlement Agreement.

5.   The form, manner, and content of the Class Notice meet the requirements of Federal Rules of Civil Procedure 23(c)(2).

6.  The court affirms the appointment of plaintiff Virginia Kulesa as Class Representative.

7.  The court affirms the appointment of the law firm Edelson LLC as class counsel.

8.   Plaintiff Virginia Kulesa shall be paid an incentive payment of $2,000, in accordance with the terms of the Settlement Agreement.

9.  Class counsel shall be paid $316,015.02 in attorney's fees, in accordance with the terms of the Settlement Agreement and this Order.

10.  Except as to any class members who have validly and timely requested exclusion, this action is **dismissed with prejudice**, with all parties to bear their own fees and costs except as set forth herein and in the prior orders of this court.

11.   Without affecting the finality of this order in any way, the court hereby retains jurisdiction over the parties, including class members, for the purpose of construing, enforcing, and administering the order and Judgment, as well as the Settlement Agreement itself.

12.  Judgment shall be entered accordingly.

Dated this 26th day of August, 2014.


_____
                    /s/
              Fernando M. Olguin
              United States District Judge

21